Case No. 21-5219, Chungji Esquel Textile Co. Ltd. et al., at balance, v. Gina Raimondo, Secretary of Commerce et al., Mr. Tice for the at balance, Mr. Aguilar for the at release. May it please the Court. All parties agree that under the Export Control Reform Act of 2018, Congress directed defendants to establish and maintain a specific entity list pursuant to the goal of addressing five extraordinarily serious national security and foreign policy threats. The question presented is whether the government can expand its entity list authority by means of a catch-all provision found in subsection 4813A.16 and thus add entities for reasons beyond the five Congress selected. The answer is no. This Court has held repeatedly, including in the 1995 decision in American Petroleum Institute, that an agency may not rely on its general authority in a specific statutory directive that finds its relevant function in a particular area. That's exactly... Is there even where Congress has directly ratified the agency's rulemaking during the interim period? Well, Your Honor, I assume you're referring to section 4826A, and I don't think that is a case of ratification of any rule with respect to the grounds upon which my client, Changi Esquil, was listed. Well, to the extent it's saying that the agency had authority to issue those rules, isn't that significant? Given the statutory provision that I know you don't want to rely on, but could you say it's a catch-all under your canon of the specific trumps the general? Well, Your Honor, just to be clear, the provision that carried forward all existing regulations did so only according to those regulations terms. And at the time, there's no dispute about this, at the time of the Reform Act of 2018, no entities had been listed for human rights violations, and the specific regulation in question, I think it's 26 CFR 74411, does not list human rights as one of the grounds for adding entities to the entity list. It lists adding entities for national security and foreign policy threats. And traditionally, until essentially the Trump administration, the grounds for adding entities to the entity list were those same serious national security and foreign policy concerns, weapons of mass destruction, terrorism, weapons proliferation, and those sorts of things. Now, it is true that... Do you dispute that they could, that they have the authority to create another list under this statutory scheme? They wanted to call this the human rights violations that impede foreign policy list, that they would have the statutory authority to do that. Do you dispute that? I think they would likely have that authority, Your Honor. How would you text... Why isn't it... You say likely, so what's your qualification? Well, because... The statute doesn't say there's only one list allowed. Well, correct. I would say that there is an argument, I think, under the expressio unius canon that the fact that the statute directs them to make a list pursuant to this purpose... Whereas, I've got my numbers right, 4811 lists a lot of things, including human rights abuses, as something that is to be enforced by this statute. So I think that would make likely kill off any expressio unius argument. It's meant to be enforced. There's references to this being enforced under the statute. And so if they could create another list, wouldn't be the... We're not going to put you on the same list as the five really, really bad things. I don't know how you compare these things. They seem incomparable. But if they have the human rights violations that impede foreign policy lists, do you have anything else that you can... Do you have anything else to tell me that would say they can't do that under the statute? Well, like I said, that's why I think they probably do have the authority. Right. So let's... I don't think it suggests that what they've done here is legal. But if they have the authority to create the second list, then your ultra vires argument has to come down to, is it clear under this statute that it has to be a separate... Could that separate list impose the exact same types of sanctions as the first list? Again, probably not. So it could do exactly the same thing. It's just called the human rights abusers list. I don't think anyone would want to be on that list for that title, but they'd have that. So it's going to have the exact same consequences, exact same operation for them. No other exact same impact on their business. And they'll be labeled a human rights abuser, X company. X company will be labeled a human rights abuser and get on that list with very, very notorious entities. And so if that's true, if we take that as true, you don't seem to be pushing back that hard on it. And the ultra vires distinction would be, it just didn't... They can't combine it into a single list. That's the question before us? I don't think that's exactly right, Your Honor. And like I said, I think even if they have that authority, it does not actually suggest what they did here is legal for two reasons. One of them is to take your hypothetical as it stands, obviously this is not what they did, but hypothetically, if they had made a list of the exact same legal consequences, that would not change the fact that there are significant and discrete special reputational and practical consequences that this list over a 25 year period has built up. This list was established in 1997. I don't know. I'm not sure the reputational consequences would be meaningfully less if put on the list of human rights abusers. And let's say in company of X, Y, and Z country, it's notorious for that. I suspect a company would be complaining just as much about reputational harm because you're on an export list, a red flag by the government. And so what in the statute, given the standard for an ultraviarious challenge, makes clear that the problem here is they can't have one list. Well, I think we're looking at what the, and I think we're looking at the authority that Congress granted to the agencies, which are of course creatures of statute. And in this section, in very specific and clear language said, establish and maintain this list pursuant to these five specific policies. So even if they did have the authority to create other lists, that would not change the fact that Congress did not grant them the authority to create a list pursuant to that directive that includes these other statutory commands. And I think it's important to think about the history. What textually says that that list must stop with those five things? I mean, it has to certainly include those five things. Those are required. Actually, what means, what tells us the standard of ultraviarious review, that it can include nothing other. You have to start it differently. Well, I'm happy to give you, I'd like to talk about specific textual clues, I think that show us, but first if I can answer the question by saying that that is the same situation as in the American Petroleum Institute case, this court held, the agency tried to argue that Congress's directive to follow a certain policy did not preclude them from following additional policies that were subordinate to that primary one. And the court said, Congress does not have to speak in thou shalt not terms in order to create an ambiguity. Congress creates a clear and specific direction. Was that an ultraviarious review case? That, Your Honor, was an APA case. Right. So I think the difficulty for you may be that to survive, establish an ultraviarious case, don't you have to point to a thou shalt not? I don't think so, Your Honor. I don't think so. And I think I could give you a few different examples, but I think the Aid Association for Lutheran's case is a good one. I think that one really sets a standard of review in a situation like this. And it basically equates in an standard of review to the situation in Chevron step one. Congress can't be right. That then the preclusion provision has zero effect. Well, it does have significant effect, Your Honor. It precludes the review of functions exercised under the APA. And as the Dart case made clear, ultraviarious claims not fall within that. And in fact, things that exceed the statutory authority of the agency. Then we're reviewing the agency's interpretation of this scheme and how the two provisions fit together exactly the same way we would be if we had APA review, which is Chevron reason. Well, the Chevron, of course, ultraviarious claims predated the APA as the Dart case held and as the Aid Association for Lutheran case held. So I don't think that's necessarily anomalous. I do take the point that it's a narrower form of review because it's not for substantial evidence. It's not arbitrary and capricious. But I don't think, like I said, the Aid Association for Lutheran's case by its terms makes clear that the review is essentially equivalent to Chevron step one. And the reason is that if Congress has spoken clearly and unambiguously to the question at issue and the agency goes a different way, that's the same thing as disregarding an unambiguous directive or violating a specific statutory command. Congress has unambiguously spoken. The agency has done something different. So I don't think it's dramatically different. It's different at all from the Chevron step one. But to get to your point, Judge Millett, with respect to how this operates in a ultraviarious context, unfortunately, I did not cite this case in my brief. I did share a copy of it with opposing counsel, and I have copies on the court if you'd like. But it's a 2012 decision, Northern Air Cargo, the United States Postal Service. It's at 674 F 3852. And as I said, I'm happy to bring a copy up to you if you like. But in that situation, the court was faced with what I believe is a situation that is equivalent to the one we're facing here, which is that the agency never grappled with the statutory language. This was an ultraviarious claim against the agency outside of the APA where APA review was precluded. And what the court said was where the agency had made no attempt to parse or reconcile the statutory language. In that case, it deemed that language ambiguous. It said you can only uphold the agency's action on the basis of a contemporary justification by the agency itself, not a post hoc explanation. So it both rejected the application of Chevron deference in that case, and in fact, found that the action could not be upheld and ultimately remanded the case to the agency in that circumstance. So I think that is the sort of ultraviarious review that we suggest would apply here. It's if the court were to find the language ambiguous, then it would not simply uphold what the agency did, but would either parse the language itself or remand to the agency ultimately at the end of litigation in this case. Now, of course, I think you make a good argument on the ratification, but I wonder if your case turns on the standard of review, then what do you do with our decision in DART? Because we acknowledge, do we not elsewhere that ultraviarious review in these I take the point that this court's case law has acknowledged that ultraviarious review is a narrower form of review. But again, I would point you to Aid Association for Lutherans, which I think points in the right direction. On the question of whether or not the agency- Yes, I understand that, but what about our DART decision? Weren't we fairly clear there or help me distinguish it? Well, I think what the DART decision said, and it's actually an analogous case because it was decided with respect to the Export Administration Act, which is the predecessor to the Reform Act. In that case, the court said, confirmed that ultraviarious review is available. And it found, in fact, in that case that there was a clear violation of the statute. And the reason why it found a clear violation of the statute was, I believe the statute had said that the agency may affirm, modify, or vacate, but the agency reversed. Well, what would you do then with the statute here and the specific to? Yeah, well, let me, if I may, I think it would be helpful if I talk briefly about 4813A and the language that that provision uses and why we think this does create a clear, unambiguous directive to the agency to carry to do a certain action and the agency has wanted- So, in other words, you think that basically qualifies the authority that was delegated under- Well, it does, Your Honor. 4813A2, that's the provision that we've been focusing on. Right. It tells the agency to establish and maintain a list pursuant to a certain policy. Those are the five most egregious national security violations. I take the point that human rights is also an egregious violation, but Congress is the one that gets to choose the policy. Section A2 is what we focus on. If you look at A1, it also requires the agency to establish and maintain a list, but not pursuant to any particular subsection. Either way, this is an addendum to our brief, if you want to look. So, it says A1, establish and maintain a list of items without saying pursuant to a certain policy. It's just establish and maintain a list. Which supports the more than one list theory. It does, Your Honor. It supports the more than one list. And 4812 is crystal clear that they have to carry out the policies set forth in I'm sorry, there's too many numbers here. 4812A and B both require, authorize and require the agency to carry out the policies articulated in 48111 through 10. I get that your point in 4813 references 4112A, but 4812A and certainly B require full enforcement of everything in that list, which includes human rights violations. You're saying that's done under 4813A1 rather than 4813A2. Well, not necessarily, Your Honor. 4812, I think in particular, is a delegation of authority to the President. They did not rely on the 4812 authority. They relied on the 4813 authority here. And so I think that, so again, whether or not the agency has the power to not, that includes the explosive devices, missiles, chemicals, biological weapons, nuclear projects, foreign military intelligence. I guess I'm looking, are you looking at 48112? Oh, 4812A. Because. It's not exactly identical. It's just, I'm not quite understanding per year, even if we call it a Chevron step one argument, how it's so crystal clear that the list must be separate. There's supposed to be a list, even under your theory in 4813A1 that enforces everything else. And you want to say 4813A2, that has to be a freestanding list. Well, is that what the argument comes down to? Well, I think it does not necessarily come down to that argument, but I will support it in this respect. Again, 48, the entity list is a list that long predated, has a history and existence that long predated the Reform Act. And we assume that when Congress enacts statutes like this, it does so against the backdrop. I don't think there's any dispute that 4813A2 is the authority for the entity list in this particular case, which was a discreet and pre-existing list. And so that's response page 25 says that that is the authority for the entity. We're in an ultra various posture and a preliminary injunction posture at the same time. And if there's no dispute that they get to just as vigorously enforce and through the same mechanisms, enforce those who engage in human rights violations that impede foreign policy, and they get to do it by having a list. Then I guess we keep coming back down to whether there could be, your argument is it can't, well, whatever list it is, it can't be this 4813A2 list. It has to be a separate list. That's the Chevron step one under your theory or ultra various playing on the absolutely plain and clear violation of law that we would have to find. There's nothing ambiguous in your view about whether it has to be one or two lists. I don't think it's ambiguous, your honor. It says establish and maintain a list. There are other provisions in the statute that provide for additional lists. And so they might have authority to do different things. It doesn't say an additional list. It says have a list for this, have a list for that. Well, again, I think- Tell my husband to have a list for groceries and have a list for errands. If he puts them on a single list, I'm content as long as he gets them all done. Well, but that is obviously what you can tell your son is different from what you can tell, what the government tells agencies, which are creatures of statute. And again, I think if you look at the API case and the Ethel Corp case, both of them are very similar in the sense that Congress didn't say do this, but don't do this, just gave a specific directive to the agency. And this court held on multiple occasions in those cases and many others that when it does so, the agency is supposed to listen to that directive and it may not do, it may not create a list that includes other things. It could separately do that, but- For purposes of a reparable, sorry, finish your sentence. It didn't even work to do that. Can I finish with that? Well, I guess the other thing I would point to, your honor, which I think shows why this is clear and unambiguous is that both A3 and A5 use the word including, which I think is notably missing from A2. Both of them say prohibit unauthorized exports, including to foreign persons in the United States or outside the United States. A5 says require licenses of items, including to, you know, under these certain conditions. I think that language is notably absent from the very next door provision A2, which does not use that including language. So I think that cuts against the reading that this is simply a minimum. It can create a list and anything else they want. Well, I just think that the clear way to read that language is establish a list that includes the five most serious national security threats. Okay. And well, I don't think it said most serious. It just said for that list. If we assume you're right, then the step here was that they combined two lists rather than having a separate one. And so then the question would be, they can list you and they can impose your client the exact same sanctions. And I can't imagine it's good for business to have to be on a human rights abuser list as opposed to this list. How would the injury, irreparable injury be any different? Well, Your Honor, I think there's serious question about whether the government would relist us in that circumstance. If you were to find that this list, this language is clear enough and ambiguous. The way to read this is Congress said, create a list with these policies and they added a sixth unenumerated one. Then I think there's a serious question about whether on remand, the government would re-add us to it. I'm just asking, let me try the question again. Would your injuries, your asserted irreparable injuries be any less or any less irreparable or just any less injurious if they had done what you're saying the statute says and had created a separate list? I do think arguably yes, Your Honor, because this is a list with thousands of entities on it. Many of them for producing military equipment for weapons of mass destruction and terrorism. We have been lumped in with nuclear proliferation. Okay, but all the bans, all the economic consequences and bans on business and exports and all of these types of things are going to be exactly the same. The fact that you would be on a bad entity list from the U.S. government and they could issue the same red flag warnings to people, you still think, it wasn't clear to me from your irreparable injury arguments that you'd be any better off. Maybe you wouldn't like the company better, I'm not sure, or you'd like the company better? This goes to the central point that I've been trying to explain, which is that the entity list is a pre-existing list. It has this history, it has thousands of entities on it with nuclear weapons proliferation. Yeah, but you'd be the only one on this new human rights abuser list, that's better. Well, I think there's a significant question whether they do that, Your Honor, and I can't speak about it in open court because it's under seal, but the condition that the government imposed makes, in my mind, very unlikely that on remand the government would try to re-add us to a list. In our view, the government has no evidence, which is consistent with all the evidence that is in the record with respect to the odious allegations they've leveled against us with regard to their reckless accusations. Am I interrupting you? Does injury count as irreparable? If the party concedes, it could be subject to those exact same injuries as long as the government just dotted its I's and crossed its T's properly. Well, I think we're here on a preliminary injunction posture. I mean, first of all, that's the exact same injury. I think it would be a different sort of injury, but I also think that the fear of some future hypothetical injury, which is not actually the action they took, they did not justify what they did based on adding us to some combined list of both the entity list plus the human rights abuser list. So the hypothetical future injury, I think, is just not before the court. That could be adjudicated in a future preliminary injunction action. On that point, Your Honor, I think under the sliding scale approach this court has not abrogated. We need to show a serious angle. Do you have to have the sliding scale to win? No, I don't think so. I think we have the clear and unambiguous reading, but I think at a minimum we've shown there's a serious legal question on the merits. I mean, again, it's hard to read that language in A2 as doing anything other than create a list pursuant to these policies and don't add your own, particularly knowing that Congress legislates against the backdrop of both pre-existing case law and its knowledge of the list and would therefore be aware of how this court would interpret a clear and specific statutory directive, especially when you compare that language to the surrounding subsections, which does not impose the same limitation on the agency's authority. Your interpretive theory, it rests on a very strong conception of express, yeah, you're nice. You have a specific provision which says create a list pursuant to the following considerations and there's a consideration, there's an additional consideration and the government is relying on some more general authority. And you say they just can't do that period full stop. But we have a lot of cases in the Chevron context, say that expression is a feeble helper in the ad law context. And you have cases where the government's won in this kind of situation, but I'm sure there are a lot of cases on the feeble helper rationale where, sorry, you've won. There are a lot of cases where the government wins on the ground that the expressio unias inference is not strong enough to preclude the government from resorting to the more general authority. So how do you reconcile? And if it's a feeble helper on a debatable point, isn't that fatal in a non-statutory review context? I don't think so, Your Honor. I don't for several reasons. One of them is that it's a feeble helper, the court has said in a few contexts, but it's also said it depends on the statutory language in the context. So, for example, the case that my friend on the other side cites, the Farrell v. Blinken case, it was a feeble helper in that case because the authority that was granted to the agency, they were going to impose a limitation found in other subsections, but not in that one. That's very different from what we have here, where we're pointing to a list that Congress has directed pursuant to five specific and only five specific goals. So I think that shows that it depends on the context. I think we also have the specific and general canon, Your Honor, which I think is equally strong. I mean, these are all variations on the same theme, right? Agreed, Your Honor. Specific, general, superfluity, right? Just depends on how you think of the interaction between A2 and A16, right? And I think it's very, this court in very strong terms, and I think the two of the best cases we've cited are the API case and the Ethelcorp case. In the API case, Congress directed the agency to emissions of ozone-forming volatile compounds, as well as certain subordinate goals, such as energy requirements. What the EPA did was create a rule that required certain use of ethanol, even though that might not reduce emissions-forming volatile compounds, and it relied on its general authority. It said under both the EPA's general grant, the Clean Air Act's general grant of authority, which allows us to promulgate rules necessary to carry out the functions of this section. They said, well, we have the authority to, you know, focus on other goals besides just emissions reduction, or in addition to emissions reduction. It's not a floor, or it's not a ceiling, it's a floor, they said. And this court very clearly, EPA cannot rely on its general authority to make rules necessary to carry out its functions, given the specific statutory directive that defined the relevant functions. And that's the same situation here. When Congress has been as clear as it is, and if you look at it in context, too, there's 15 different actions Congress has required the agency to carry out. And then the A-16 says, and any other action, any other action that you want to carry out. It's very detailed about what it wanted to do, and in some of those sections, it said, do it pursuant to a specific policy, and some of them, it said, do it to all the policies in there. I think when you read that language in context, it does become clear that this is not a situation where we're looking at, you know, other statutes, other provisions elsewhere, to try to gin up a expressio unias argument. It's clear from the very face of the language that Congress. Just one more question on interpretive principles, and another one which might be relevant here. Government, I don't think, invoked this, and I'm not sure why, but there is a presumption that when statutes govern the President's exercise of foreign policy, they are, in cases of ambiguity, they are construed not to constrain the President's discretion. Wouldn't that have a lot of sway here when we're talking about how to manage export restrictions on human rights abusers abroad? Well, I don't think so, Your Honor, and I think the reason is really the legislative history in this case, and by that, I mean the way that. The statutory history. Statutory history, exactly, the way the Reform Act came into being. Originally, these sorts of regulations were under the Export Administration Act. After that, the authority in that statute lapsed. The President continued the export control regulations under the authority of IEPA, which, as you know, is a very broad, broad executive authority to deal with national security and foreign policy. In 2018, Congress overhauled that regime by placing these regulations on a new statutory footing, and when it did so, it imposed certain restrictions in certain places. It gave specific directives about what it wanted the agency to do on a going-forward basis, and the agency's response to that with respect to the entity list was to completely ignore it. It did not continue to do business as usual. It simply continued the exact same trajectory it had already done, where it was expanding the grounds for the entity list. It has never engaged outside of this litigation. Certainly, the government has not pointed to anything. It has never engaged outside of this litigation with whether or not there is any limitation imposed on that at all. The floor or minimum theory that the government advances is a litigation theory. It is not one that the agency has undertaken at any time prior to this case. Happy to answer any other questions or preserve the balance of my time. Thank you. I am pleased to report Daniel Aguilar for the Federal Defendants. Congress enacted the Export Control Reform Act here to enhance the executive's ability to use export controls to protect national security and foreign policy. It explicitly ratified all previous actions that the executive branch had taken to further that. That includes the Federal Registered Notices we cited explaining that we can add entities to the entity list when they act contrary to our foreign policy interests, including violation of human rights. It included the several designations that we made of Russian entities for a variety of reasons, including acting contrary to our foreign policy interests and taking Crimea from Ukraine, interfering in the United States elections, etc. Sorry, had there been entities, I should know this and I'm just blanking, had there been entities added to the list just for human rights violations prior to the amendment? No, Your Honor, not specifically for human rights. The Export Control Reform Act, what Congress did was it provided us with a comprehensive sense of authority to safeguard the country, but then contrary to Commerce Department's and the executive branch's longstanding understanding of its own authority, it said you cannot add entities to the entity list. I see. You have rules, orders, and determinations, and determinations are interpretive positions in the air. And quoting from 50 U.S.C. 4826A, and it also says four other forms of administrative action. I mean, Congress here was pretty broad in saying that we are ratifying and confirming the executive branch's understanding of its own authority. Yeah, though you might read this to require agency action as opposed to just an expressed view. I'm not sure. And that's why, Your Honor, we were also pointing to the actions where we had listed entities acting contrary to our foreign policy interests. Excuse me, when Russia invaded Crimea and when Russia took actions that were contrary for interests in spreading mischief. But Congress didn't have any experience, concrete experience, that it would have been aware of, of someone being listed just for human rights, asserted human rights violations? I'm sorry, Your Honor. Commerce didn't have, you had, I thought you said, maybe clarify if I misunderstood your answer. Prior to the statute being enacted, the Commerce hadn't, or the federal government had not listed someone just for human rights violations. No, Your Honor, we took that action here, but we had expressed our understanding that this is the authority that we generally have. And you expressed that where? We had expressed it in the federal register notices. I believe that we said that at the beginning of our brief, starting in about 2012. Okay. And then we had consent. But it hadn't yet been applied, so rubber had never met the road in this regard. I suppose it's true, Your Honor. But I think, you know, again, And since, oh, finish your sentence, I'm sorry. Oh, sure. But again, I think, as you noted, we're here in a particular strange circumstance. This isn't here on APA review about trying to parse out the particular delineations of the articulated authority here. We're here on non-statutory ultra vires review, where opposing counsel is seeking a preliminary injunction to take an entity off of the entity list to not subject them to our export controls when the United States has made a determination that they're acting contrary to our foreign policy interests. Since the 20, so we talked about before the 2018 Act. Since the 2018 Act, up to this listing, I know that there were, I guess, 10 other entities that were listed with them. But between 2018 and this listing, had someone who engaged in human rights violations been listed or asserted human rights violations been listed solely just for that? Contemporaneously, we listed other entities. Not contemporaneously, but I know that there were 11. You're talking about between 2018 and this listing? And this listing, yes. I'm sorry, I wasn't clear. So since once the statute's enacted, since the enactment of the statute in 2018, whatever date that was, and the listing that's, they are challenging, at least for their name now, in that interval, were there any human rights abuse lists? Not that I'm aware of. This is the first time in history of these types of export controls that someone has been put on the entity list for asserted human rights violations, alone. It was about a two-year span in between those. So yes, after two years after the Act, this was the listing. This never happened until now. No, but again, it's not limited to human rights violations, right? As I understand their theory, it is that we are limited in placing entities onto the entity list solely for what's described in 4811-2A. So if you take, for example, the policy interests that Congress identified in 2B, if somebody threatens the qualitative military superiority of the United States, we cannot place them on the entity list for that reason. Or if you look at 2E, our ability to sustain and fulfill international obligations, we cannot place an entity on the entity list if they threaten or act contrary to our ability to do that. We can't use the export controls against them for that reason. You can have as many lists as you want. You could have the entity list, and you could have the entity part B list, entity prime list, and list everybody there. I don't understand how that would impair, at least for me, at this level of review that we're doing, we're not digging in, as you rightly pointed out, any more deeply than you've got a pretty sound argument that you could have other lists. But this is the worst of the worst list, I guess is what they would say. This is the notorious list. So it's not that they're tying your hands. It's just Congress said, look, here are the things, the five things that, in fact, they took the time to say these are the five, I'm putting words in Congress's mouth here, but it seemed to be worst of the worst in that they are existential threats to the United States, those types of violations. That's that list. It's like the FBI, you know, top 10 most wanted. Doesn't mean we don't want everyone else. But these are the top 10. And then you can have your other list, and you can label it however you want. You can do every single thing to punish them that you're doing here. But it's just not how this list has been used. Certainly at the time Congress acted, they weren't thinking of this as a human rights list. If they were thinking of it as a human rights abuse list, why would they say for purposes of 2A? So getting to that, I think that's the fundamental difference between our respective statutory constructions. We read this as Congress saying, so, for example, in 4813A, it says, create a list of items for control. So that includes weapons. It includes various types of technology, gases, et cetera. And so Congress said, look, we don't know particularly what kinds of items should be on this list. Please use your discretion. For the next subsection 2, it then says, create an entity list, or we know that you already have one. And be sure, at a minimum, that it needs to contain these particular types of activities, terrorism. It didn't say at a minimum. That's your reading, but yes. I'm sorry. Congress said to have a list that includes these five. Yes. It says you need to have a list. It needs to, if you determine that anyone- You must have a list that includes these five. Yes. And then it's not limiting that authority. It's not saying you cannot have other reasons to use the export controls to require a license before doing this. And again, the entity list is a creature of regulation. It's a creature of long-standing regulation. Congress didn't specify in 4813 that there is such a thing called the entity list, and it must be constricted only to these things, indeed, in subsection 16 of that. What Congress says is, and you shall undertake any other action necessary to safeguard our policy objectives that we've identified that is not otherwise prohibited. That's a very broad branch of authority. And what Congress said in the purposes section of the Reform Act, in 4811, is it says these are the purposes for the export control. And then the last section there, I believe it's paragraph 11, says you can't go beyond this. This is the universe of policy objectives that we have given you, and you need to use the export controls for these purposes. But what it didn't say is, and we care about our military superiority, we care about our international obligations, and we care about our foreign policy, clearly, but you can't place people on the entity list for those reasons. And Judge Millett, as you're pointing out, I think it only underscores the correctness of our position that we can create multiple lists. But that's a level of formalism, I think, that sort of blinks at reality, that because you might have one combined list as opposed to two or three or 17 different other lists, and somehow then Congress has prohibited and barred the agency from acting here in such a clear and mandatory manner that it's a patent violation of law for the executive branch to be concerned about foreign policy and to place entities on this list when they act contrary to our foreign policy national security interests. And how do we know, in the wake of aid association for Lutherans, that that ultra-various standard that you just articulated is the one that's going, that we should apply here, as opposed to their argument that there's a bit softer one in this context? Well, as I note, Your Honor, this question of the exact scope of ultra-various review under the Export Control Reform Act is also being considered by this court in FedEx Corporation versus Department of Commerce. I believe it was submitted November 5th of last year. So that's going to be decided by this court very likely in that case as well. But what I would point the court to is its decision in Griffith versus FLRA, where it laid out the ultra-various standard of review, and it said, an error of fact of law is insufficient. We have said that review may be had only when the agency's error is patently a misconstruction of the act or when the agency has disregarded specific and unambiguous statutory directive, burdened variety errors of law or fact are not enough. And that seems to me to be the standard of review here, particularly. How are you distinguishing the Lutheran Aid Association for Lutheran case? I think so. As I understand Aid Association for Lutherans, it was there as well that it was a clear violation of the statute. And so this court has used some different formulations of it, whether it's a patent misconstruction or a clear misconstruction, as I think Dart says. But it's a clear and unambiguous directive that leaves no determination to the contrary. And here, I think, one, we're just correct on statutory interpretation at bottom. But two, even if you think, well, you know, maybe on balance, there's a better construction, maybe on balance, there's some more reticulation here. I mean, that's sort of the fine grained determinations that you would usually be making on Administrative Procedure Act review under Section 706 of the Administrative Procedure Act. But what we know what Congress said here under the Export Control Reform Act is that does not apply. We do not want Administrative Procedure Act review of these sorts of determinations. And Congress specifically cited the standards of review of the APA. It cited Section 706 as part of the prohibition of APA review. So that does not apply to these kind of determinations. So necessarily, it has to be a higher standard because otherwise, I think you'd see a lot of entities, as you're saying, who are on the determination that they present a substantial threat to the interests of the country, raising non-statutory ultra vires arguments that, you know, either you didn't have the specific and articulable facts to put me on the entity list, or actually, I'm on here for this statutory reason and the government's reason under 2A is pretextual, or any other number of challenges to the executive branch's determination here about what's necessary to protect our national security and foreign policy. And I think that that's exactly what Congress was trying to stop at the outset in enacting that bar on APA review. It said, we will allow for APA review when there is a particular enforcement proceeding where you've had an administrative record. That's not an issue in this case, where the agency has had an opportunity to respond to particular challenges. But this is a rare bird. And this is not the kind of challenge that should be allowed to, again, obtain a preliminary injunction, an extraordinary form of relief against the executive branch's considered determination here about what is in our foreign policy interests. Well, let me ask you, in terms of your rare bird argument, the argument here is that, you know, there have been a lot of human rights violations asserted either by the president or the agency, but not in regard to this particular list that is the list at issue. And why isn't that some indication that a couple of things, either Congress was not as clear as it might have been, or the agency itself in the interim offered no interpretive language, and this rare bird comes along 25 years ago and lists this entity for human rights violations. So we do, if you can't find anything where Congress was explicit, then you look at the agency's contemporaneous interpretation. And we don't have that here. So I think responding to those points generally, we don't, so what the agency has consistently said before this is that foreign policy reasons acting contrary to our foreign policy interests and human rights abuses are reasons that we can place somebody on the entity list. And what I'm getting at is this is such a serious action by government. And that's the argument here. And the agency has never interpreted its authority to allow it to do what it did. And it doesn't point to evidence that Congress contemplated this. So I understand one argument that says, well, looking at DART, the standard of review here is much higher, but we have all these other cases that suggest not necessarily that high, that if you can show Congress clearly thought these five purposes were critical. And while the agency can take this additional action, it never has before. It hasn't, despite the world full of claimed human rights abuses, it hasn't exercised this authority before. So that's the rare bird coming back at you. Well, I think, Your Honor, that's because, and it's consistent with our understanding of the statute, is that this is a discretionary listing that the executive branch was able to make, right? As we've explained under 4813A2, Congress has mandated the essential limits of what this must contain at a minimum. If anybody is conducting acts of terrorism or threatening our military capabilities, they must be placed on this list. But that's far from saying there is a bar from placing entities on the entity list for any other reason. And I think we understand that, but Congress didn't, you haven't cited any indication that Congress actually contemplated having this other list. I mean, Judge Millett has been through with Petitioner, or Appellant's counsel, other provisions. But I just wonder to what extent, on ultravirus review, we can fill in all these gaps? I don't think that you necessarily need to fill in any of the gaps. I think what, and I'm sorry, I hadn't read the case that opposing counsel had cited to me yesterday very closely. But as I understood that case to be on ultravirus review, it said, look, it doesn't necessarily, we don't need to come to a conclusion one way or the other about what the statute means. So long as reasons are plausible or colorable here, that's sufficient to defeat ultravirus review. I believe there, the appellants had gotten an injunction against the government's action, and then this court said, no, you don't get that injunction. This has to go back for further proceedings. So I think what ultravirus review requires is, if you have an open and shut case, which is what this court considered DART to be, maybe that is sufficient. But I think as you're looking to these cases that go through these sort of exercises in statute for construction, I'd point the court to Adirondack Medical Center, where this court was considering exactly what the agency could do. And it said there, the expressio unius canon is the people helper, where we presume Congress has granted the agency reasonable discretion. And that canon saying like, well, maybe because we granted you something specifically, we've prohibited the rest, that can be countervailed by a broad grant of authority contained within the same statutory scheme. And I think that that's what we have here. If you look to what Congress granted the president authority to do in 4812B7, it said the president and personally create a list of entities that are threatening our national security and foreign policy without limitation. And then 4813 is directing the rest of the executive branch to assist the president in carrying out those and reserves a broad grant of authority saying that the executive branch, Commerce Department, State, Treasury, et cetera, can take any other action that is not otherwise prohibited. And I think the key difference here is they're saying because Congress specified a grant of authority, it is necessarily prohibiting the rest. And that's at least debatable. And I think I still haven't heard, and maybe there is one, but I'm not aware of it. I haven't heard a reason why Congress would pass the Control Reform Act to grant the executive the authority to use these export controls, ratify all previous action, but nevertheless, then for the first time, severely constrain our ability to add entities to the entity list for only five reasons. Even if an entity is threatening our military superiority, we can't add them to that reason, even if it's harming our international obligations. And that's all I'm getting at is under the five reasons that are specified, there are ways to write violations that are human rights violations that come within the five, but that's not what happened here. That's all I'm trying to get at. I agree, Your Honor. I agree it's discretionary. It's not a mandated listing. And there may be other cases where, you know, those reasons would overlap and that Congress didn't write it that way. But the fact that Congress could have written it another way does not necessarily mean that Congress prohibited and tied the executive branch's hands in this instance. And I think the concession that we could place entities on an ultra-formalistic separate piece of paper for the exact same substantive export controls and the exact same reasons under the exact same regulations confirms the understanding here that we are not acting so far outside our statutory authority as to warrant non-statutory ultra-valuaries review. So you understand counsel's concession to be that broad? That's what the district court understood it as well, Your Honor. Joint Appendix page 178 where it quoted the transcript from the preliminary injunction hearing as I understood it. I know, but that's in a broader context. Here, we're just dealing with the ultra-valuaries. And I just want to be clear about that because often now we're into this express statement requirement by Congress. The Supreme Court's emphasized that in so many different contexts. And I just wonder here, that's what I understand is happening. That's part of the argument. But you're saying absent a plain statement by Congress, you cannot do this? Or I suppose you can do this? Regardless of what we may have said before? I think that's consistent with what this court has said before. And I point to DART there as well. What this court said is, in DART, we can ultra-valuaries review as long as we narrow and must not simply involve... So no question about that. All right. And I suppose you would read our decisions then to say, even where there is a serious question. And you're just saying there's no serious question. So here we are saying, one, there's no serious question. If this case were here on Administrative Procedure Act review, we wouldn't... No, no, no. I understand that. But I'm talking about ultra-varies. Sure. And on ultra-varies, as I understand this court suggests, ultra-varies review is possible where there is a clear and mandatory statutory directive that was nevertheless violated. That's from DART at page 231. No, I understand. But as I've said, and I thought your earlier answer to my question about DART said, well, but there are these other views. And then you went on to talk about other views of ultra-varies review, narrow though it be. Yes, Your Honor. I think those are all... I don't necessarily see a difference between them. I think that they're all consistent with each other in different formulations. And I don't necessarily know that this court needs to get into a reticulated examination of them. But if you do, I think that patently in this construction of the act, Griffith, it seems like that that's the appropriate standard. So one other question. In this particular case, given what's happened subsequently, there is no remedy, as I understand the position. Is that correct? Do you mean the preliminary injunction remedy or the delisting from the entity list? I mean, in terms of what the agency did subsequently in finding that it would have reached a different conclusion provided these two conditions are met. And one of those conditions we're told cannot be met. All right. I think that that fact and the reasons for it only underscore why plaintiffs are not entitled to a preliminary injunction of the executive branch's termination here. Can I ask? So that condition that's under seal might impact your eagerness to pursue this. Don't flirt out a sealed fact in open court. Just give me a yes or no answer to the question. Are there any recently changed circumstances that impact that condition one way or the other? I am not aware of any, Your Honor. I'm happy to answer further questions, but we'd ask you to affirm the denial of the preliminary injunction. Thank you, Your Honor. I'd like to make three points, unless the court has any questions. First of all, just briefly on the standard of review. I don't think there's any dispute that in this case, UltraMirror's review is available to us. That's what the Dart case says. I understand my friend on the other side mentions the Griffith standard,  This court has also said that it's not going to be able to do that. Used words like extreme, hail Mary Payton. I think the best way to reconcile that sort of language and those descriptions of the UltraMirror standard with the Aid Association for Lutheran case, which is what we think sets forth the proper standard here, is in those cases, there was a review provision that precluded review generally. Whereas here, there's no dispute that UltraMirror's non-statutory review, which predates the APA, is available to us. I think that the Northern Air Cargo case, which is the one I mentioned, as well as the Aid Association and the Dart case, all found that the plaintiff prevailed on that non-statutory UltraMirror's review. It is not an insurmountable barrier by any means. Briefly on that Northern Air Cargo case, which is the one I cited today, what happened there is the court actually found ambiguity and said, we cannot affirm the government's interpretation given that ambiguity because they failed to provide one during the provision. So it was not a case where plaintiff lost. In fact, the government lost in that case. The second point I would make briefly is that, you know, I think it's entirely sensible that Congress wanted a list of the worst of the worst. And that's what that language reflects to Judge Millett's points, the, you know, 10 most wanted. And it would dilute that list to add entities for reasons other than those lists. Not only are those the worst of the worst, it was also the traditional contents of the list. It was done pursuant to that specific policy. And I think it's strange to imagine that given the statutory history, Congress would have enacted a law that specified the agency continued to do exactly what it's been doing and what the list has always done. I think when counsel was describing that, he even used the word including, make a list that includes these things. But of course, that is not what that language says. It doesn't, poignantly does not use the word including. Now, of course, Congress can change its mind. In fact, there's language that is circulating. It's been passed by both houses now that would actually literally add a Roman at six, the list of five, six being serious human rights abuses. In that situation, going forward, there should be little doubt that they would have the authority to add entities to the entity list for that purpose. But I don't think that, I think that strongly suggests that they don't. Does that legislation require the inclusion? All, literally all it does is 4811-2A has the five, it adds six. Well, we'd say it adds, it gives the agency the authority to add entities to the list for that purpose. Would it allow them to say, yeah, but we don't want to? No. Right. It would be required for them. That will be the specific directive. And again, as the API case and others make clear, Congress does not need to say, do this, but don't do that in order to make its intentions clear. You can set both the policy and the means of effectuating that policy. The final point is, I think your Honor asked, Judge Millett asked about whether this is formalistic. In addition to the points I made, which is that this is the worst of the worst list, I would also point out that there are special procedures with the entity list that would not necessarily be held in some future, found in some future list, such as you need a unanimous vote of an interagency committee to be removed from the list. That's part of what explains the current predicament that we are in. We're stuck here because of this problem. We've been conditionally removed, but are in sort of limbo. And the irony of all this is that this company is an ethical company. It prides itself on its ethical company. It's a founding member of the United Nations Global Compact, which is a sustainability and human rights company. It's been part of this region for a long time. It pays farmers directly. It pays double or triple the minimum wage. It's insult upon injury to be added to this list of the worst of the worst and have really no way of removing. So I would urge this court to find at least a serious legal question on the merits and either enter the injunction or remand with instructions for the court to consider all of the preliminary injunction factors. Thank you. Thank you, counsel. We'll take the case under advisement.
judges: Rogers, Millett, Katsas